UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

DARRELL SMITH,

            Plaintiff,

     v.

DR. ABDUR-RAHMAN,

            Defendant.

No.  2:13-cv-0738 KJN P

ORDER AND FINDINGS AND
RECOMMENDATIONS

I.  Introduction

      Plaintiff is a state prisoner proceeding without counsel.  Plaintiff alleges that defendant was deliberately indifferent to plaintiff's serious medical needs in violation of the Eighth Amendment while plaintiff was housed at High Desert State Prison ("HDSP") from 2011 to 2012. Defendant's motion for summary judgment is before the court.  As set forth more fully below, the undersigned finds that defendant's motion for summary judgment should be granted in part and denied in part.

II.  Plaintiff's Complaint

      In his verified complaint, plaintiff alleges that on November 19, 2012, and January 16, 2013, defendant denied plaintiff medical treatment for his serious medical needs without giving plaintiff physical examinations.  (ECF No. 1 at 3.)  Plaintiff incorporated, by reference, plaintiff's consumer complaint with the California Medical Board.  (Id.)  Plaintiff contends that defendant

removed "all" of plaintiff's medications[1] and all medical appliance chronos[2] without performing a physical examination of plaintiff.  (ECF No. 1 at 5.)  Plaintiff alleges defendant refused to address plaintiff's serious pain and stiffness in both hands, and his symptoms of renal disease.  (Id. at 5-6.)  Plaintiff claims defendant allowed custody staff to throw away plaintiff's boots which were approved by a podiatrist for plaintiff's chronic plantar fasciitis and back pain caused by spinal stenosis.  (Id. at 6.)  Plaintiff alleges that defendant removed plaintiff's low bunk chrono, which was provided by a physician because of plaintiff's asthma, shortness of breath, and spinal stenosis.  (Id.)  Plaintiff claims he was experiencing daily pain and suffering.  (Id. at 7.)  Liberally construed, plaintiff contends defendant intentionally interfered with,[3] and was deliberately indifferent to, plaintiff's serious medical needs.

III.  Defendant's Motion for Summary Judgment

Defendant moves for summary judgment on the grounds that defendant was not deliberately indifferent to plaintiff's serious medical needs under the Eighth Amendment. Defendant contends that the undisputed facts show that defendant provided plaintiff with adequate care and treatment for his various chronic health issues; that the requests refused by defendant were not medically necessary, and that plaintiff's disagreement with defendant's decisions does not rise to a constitutional violation.  Finally, defendant contends he is entitled to qualified immunity because his conduct was objectively reasonable.  Plaintiff filed an opposition.

---

[1]  Plaintiff provided a medication reconciliation form that reflects defendant stopped plaintiff's prescription for Acetaminophen with Codeine.  (ECF No. 1 at 15.)

[2]  Plaintiff provided a medical classification chrono reflecting that plaintiff was granted a permanent lower bunk, therapeutic diet, and boots chrono.  (ECF No. 1 at  36.)

[3]  Plaintiff provided the February 5, 2013 Director's Level Decision, which articulated plaintiff's claim as follows:

> Your CDCR 602 HC indicated on November 19, 2012, Dr. Abdur-Rahman denied you medical treatment, stating "you had 'nothing coming' from him because you had no[t] withdrawn other appeals."

(ECF No. 1 at 38.)  The reviewer further noted that during the December 17, 2012 interview with plaintiff, plaintiff "related that every time [he] [tried] to talk to Dr. Abdur-Rahman he tells [plaintiff], 'You have nothing coming.'"  (Id.)

On April 16, 2014, defendant was granted an extension of time until May 2, 2014, in which to file a reply.  (ECF No. 28.)  On May 5, 2014, defendant filed a reply.  (ECF No. 29.)  On May 13, 2014, plaintiff filed an objection, noting defendant's reply was untimely filed.  Defendant did not address the issue of timeliness in the reply, and did not respond to plaintiff's objection.  Because the reply was untimely filed, the undersigned has not considered the reply.[4]

A.  Legal Standard for Summary Judgment

Summary judgment is appropriate when it is demonstrated that the standard set forth in Federal Rule of Civil procedure 56 is met.  "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).

> Under summary judgment practice, the moving party always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (quoting then-numbered Fed. R. Civ. P. 56(c)).  "Where the nonmoving party bears the burden of proof at trial, the moving party need only prove that there is an absence of evidence to support the non-moving party's case."  Nursing Home Pension Fund, Local 144 v. Oracle Corp. (In re Oracle Corp. Sec. Litig.), 627 F.3d 376, 387 (9th Cir. 2010) (citing Celotex Corp., 477 U.S. at 325); see also Fed. R. Civ. P. 56 advisory committee's notes to 2010 amendments (recognizing that "a party who does not have the trial burden of production may rely on a showing that a party who does have the trial burden cannot produce admissible evidence to carry its burden as to the fact").  Indeed, summary judgment should be entered, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.  Celotex Corp., 477 U.S. at 322.

---

[4]  Defendants' reply was due on Friday, May 2, 2014, but was not filed until Monday, May 5, 2014.  The undersigned has read defendants' reply, and the decision rendered herein would not be different had the reply been timely filed and considered.

1  "[A] complete failure of proof concerning an essential element of the nonmoving party's case

2  necessarily renders all other facts immaterial."  Id. at 323.

3       Consequently, if the moving party meets its initial responsibility, the burden then shifts to

4  the opposing party to establish that a genuine issue as to any material fact actually exists.  See

5  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  In attempting to

6  establish the existence of such a factual dispute, the opposing party may not rely upon the

7  allegations or denials of its pleadings, but is required to tender evidence of specific facts in the

8  form of affidavits, and/or admissible discovery material in support of its contention that such a

9  dispute exists.  See Fed. R. Civ. P. 56(c); Matsushita, 475 U.S. at 586 n.11.  The opposing party

10  must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome

11  of the suit under the governing law, see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248

12  (1986); T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir.

13  1987), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return

14  a verdict for the nonmoving party, see Wool v. Tandem Computers, Inc., 818 F.2d 1433, 1436

15  (9th Cir. 1987), overruled in part on other grounds, Hollinger v. Titan Capital Corp., 914 F.2d

16  1564, 1575 (9th Cir. 1990).

17       In the endeavor to establish the existence of a factual dispute, the opposing party need not

18  establish a material issue of fact conclusively in its favor.  It is sufficient that "the claimed factual

19  dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at

20  trial."  T.W. Elec. Serv., 809 F.2d at 630.  Thus, the "purpose of summary judgment is to 'pierce

21  the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'"

22  Matsushita, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e) advisory committee's note on 1963

23  amendments).

24       In resolving a summary judgment motion, the court examines the pleadings, depositions,

25  answers to interrogatories, and admissions on file, together with the affidavits, if any.  Fed. R.

26  Civ. P. 56(c).  The evidence of the opposing party is to be believed.  See Anderson, 477 U.S. at

27  255.  All reasonable inferences that may be drawn from the facts placed before the court must be

28  drawn in favor of the opposing party.  See Matsushita, 475 U.S. at 587.  Nevertheless, inferences

4

are not drawn out of the air, and it is the opposing party's obligation to produce a factual

predicate from which the inference may be drawn.  See Richards v. Nielsen Freight Lines, 602 F.

Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d 898, 902 (9th Cir. 1987).  Finally, to

demonstrate a genuine issue, the opposing party "must do more than simply show that there is

some metaphysical doubt as to the material facts. . . .  Where the record taken as a whole could

not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for

trial.'"  Matsushita, 475 U.S. at 586 (citation omitted).

    By contemporaneous notice provided on March 26, 2014 (ECF No. 24-1), plaintiff was

advised of the requirements for opposing a motion brought pursuant to Rule 56 of the Federal

Rules of Civil Procedure.  See Rand v. Rowland, 154 F.3d 952, 957 (9th Cir. 1998) (en banc);

Klingele v. Eikenberry, 849 F.2d 409 (9th Cir. 1988).

    B.  Facts[5]

    1.  At all relevant times, plaintiff was in the custody of the California Department of

Corrections and Rehabilitation ("CDCR"), and housed at HDSP.

    2.  Defendant is a licensed medical doctor and board certified in internal medicine.  He

has been employed by CDCR as a staff physician at HDSP in Susanville, California from March

2007 to the present.

    3.  On April 14, 2004, plaintiff was provided an outpatient rheumatology consultation

with Dr. Scott T. Anderson, Physician and Surgeon, who noted the following impression and

plan:

> IMPRESSION:  The hand changes could represent a congenital variant with Boutonniere deformities,[6] rheumatoid arthritis, or systemic lupus erythematosus.  Systemic lupus is a particular concern in light of the history of nephritis.

////

---

[5]  For purposes of the instant motion for summary judgment, the court finds the following facts undisputed.

[6]  A boutonniere deformity occurs when a tear in the tendon sheath, which looks like a buttonhole, causes the finger to be bent down at the middle joint and bent back at the end joint.  Troup v. Smith, 2013 WL 4544050, *3 n.8 (E.D. Cal. Aug. 27, 2013).

PLAN:

   1.  Rheumatoid fact.

   2.  Check antinuclear antibody.

   3.  For now, avoid anti-inflammatory drugs.

   4.  Return to clinic in one month.

EDUCATION:  The plan was discussed with the patient.  I think on balance he may well end up having systemic lupus.  Treatment options were discussed.

(ECF No. 26 at 33, 54.)

    4.  On February 6, 2006, plaintiff was issued a chrono by Dr. D. Mehta and Chief Medical Officer Joseph Bick at CMF stating that plaintiff had "chronic hand arthritis for the last 5 years." (ECF No. 26 at 29.)  The doctors noted plaintiff's limited capacity finger function, and stated that "[b]ecause of his ongoing arthritis in the small joints of both hands, he will require a 10-minute rest every 10 minutes when writing and typing.  This condition seems to be a permanent one." (ECF No. 26 at 29.)

    5.  On December 6, 2007, plaintiff was seen by Dr. Michael J. Harrington, Napa, California, for a rheumatology consultation.  (ECF No. 26 at 55.)  Dr. Harrington noted the following:

IMPRESSIONS AND DISCUSSION:

A 34-year-old man with at least a few year history of worsening hand deformities with boutonniere deformities, as above.  Tests for "rheumatoid arthritis and lupus" said to be negative.  ? x-ray several years ago said to have been "normal."

As you know, the boutonniere deformities are fairly classic for rheumatoid arthritis, but can occur as an isolated finding without that diagnosis.  Arthropathy of lupus, when seen, is much more likely to involve swan neck deformities (so called Jaccoud deformity).

SUGGESTIONS:

I would obtain repeat hand x-rays and also repeat a test for rheumatoid factor.  If this were borderline positive, I would also obtain a test for anti-CCP antibodies.

If the above are normal or unremarkable, we might want to refer the

> patient to a hand specialist, such as Daniel Birkbeck here in Napa,
> for consideration of injection or splinting.  He might even come to
> synovectomies with worsening deformity.

(ECF No. 26 at 56.)

6.  On July 30, 2008, plaintiff was evaluated by Dr. Jeffrey W. Ralph at the Spine & Nerve EMG Unit, Department of Neurology, University of California San Francisco, referred by CMF.  (ECF No. 26 at 30, 59.)  Plaintiff complained of five years of progressive joint pain with numbness in all digits, but most prominent in the last two digits and worse on the right, as well as longstanding neck pain.  Bilateral median and ulnar nerve conduction studies and right upper extremity EMG studies were performed.  Dr. Ralph noted the following impression:  "These abnormal electrodiagnostic studies provide evidence for bilateral median neuropathies at the wrists.  However, these neuropathies do not explain his symptoms."  (ECF No. 26 at 30, 59.)

7.  On November 11, 2008, plaintiff received an MRI of his right hand and wrist in Napa, California, and Dr. Andrew J. Nicks concluded the following:  "Probable disruption of the ulnar collateral ligament of the PIP joint.  I suspect there is also an injury to the volar plate and the pulley.  The tendons are intact."  (ECF No. 26 at 58.)

8.  On February 19, 2009, plaintiff received carpal tunnel release on his right upper extremity at the Queen of the Valley Medical Center in Napa.  (ECF No. 26 at 34.)

9.  Plaintiff was incarcerated at the California Medical Facility ("CMF") in Vacaville, California from 2000 to October 2012, and at HDSP from October 2012 through May 2013.

10.  While housed at CMF, Smith was issued a permanent Medical Classification Chrono[7] with a "Low Risk" intensity of services designation, and chronos for a Renal Diet, upper bunk with ladder or low bunk, personal soft shoes with arch supports, and personal boots with orthotics.  (ECF No. 24-5 at 5-8.)  The March 20, 2012 chrono states that the personal boots with

---

[7]  A medical "chrono" is a recommendation, usually related to an inmate's medical condition or course of treatment, issued by a prison physician.  See e.g., Cal. Code Regs. tit. 15, § 3043.5(d) (describing the medical chrono also known as "Form 128-C"); see generally Cal. Code Regs. tit. 15, § 3000 (defining "general chrono" written on CDC Form 128-B "which is used to document information about inmates and inmate behavior").

1    orthotics were "to help accommodate chronic plantar fasciitis and back pain as well as spinal

2    stenosis."[8]  (ECF No. 24-5 at 7.)

3         11.   When an inmate first arrives at a prison, the inmate's chronos are discontinued and

4    must be redone for that institution.  (ECF No. 24-4 at 3.)  Nurse Practitioner Miranda signed the

5    October 9, 2012 Comprehensive Accommodation Chrono discontinuing plaintiff's prior chronos,

6    specifically noting the bottom bunk chrono was discontinued.  (ECF No. 24-5 at 9.)  On

7    plaintiff's arrival at HDSP, the nurse practitioner told him that his chronos were discontinued.

8    (Pl.'s Depo. at 31-32.)  Plaintiff's initial Comprehensive Accommodation Chrono at HDSP dated

9    October 11, 2012, designated no accommodation items.  (ECF No. 24-5 at 9.)

10        12.   Plaintiff was seen "on a sick call visit as a new arrival to HDSP" by defendant on

11   October 12, 2012, and was requesting a renal diet.  (ECF Nos. 24-4 at 3; 24-5 at 10-11.)

12   Defendant ordered the renal diet for plaintiff.  (ECF No. 24-5 at 15.)  Defendant addressed other

13   chronic care issues with plaintiff, including those relating to a past medical history that included

14   chronic kidney disease, hypertension, hyperlipidemia, psychiatric disorder, cervical neck stenosis

15   with surgical laminectomy and fusion, and asthma.  Defendant approved plans for nephrology

16   specialty clinic assessment, laboratory testing, and care as to plaintiff's chronic kidney disease.

17   (ECF No. 24-5 at 11.)  Defendant determined that it was not medically indicated for plaintiff to

18   continue taking Tylenol with Codeine at what then was a year or more after his neck surgery with

19   a stable condition, and planned that it be tapered and discontinued as of October 16, 2012.  (ECF

20   No. 24-5 at 11.)  Defendant prescribed Nortriptyline for chronic pain, and authorized continuation

21   of other medications and regiments for plaintiff's various chronic conditions.  (ECF No. 24-5 at

22   10.)

23        13.   Upon seeing plaintiff on October 12, 2012, defendant issued a Medical Classification

24   Chrono for plaintiff that designated him "High Risk" as to intensity of services for medical care,

25   to allow plaintiff to be placed in an appropriate facility to accommodate his chronic care medical

26   needs.  (ECF No. 24-5 at 15.)  Defendant issued a Comprehensive Accommodation Chrono that

27   ───────────────────────

28   [8]  "Stenosis" is defined as "[a] stricture of any canal or orifice" or narrowing.  Stedman's Medical
     Dictionary 1832 (28th ed. 2006).

designated the Renal Diet, and made no other changes to the initial HDSP Accommodation Chrono.  (ECF No. 24-5 at 16.)

14.  Plaintiff was seen by defendant on October 24, 2012.  Defendant provided and authorized treatment for plaintiff relating to his chronic care issues, including kidney disease and asthma.  (ECF No. 24-5 at 17-18.)  Plaintiff requested a Tylenol with Codeine chrono and a low bunk chrono.

15.  Plaintiff was seen by defendant on November 5, 2012.  (ECF No. 24-5 at 19-20.) Defendant provided authorization for further treatment of plaintiff requested by nephrology specialty care and for X-rays requested by a neurosurgeon specialist.

16.  Plaintiff was seen by defendant on November 19, 2012.  Defendant interviewed plaintiff in his review of plaintiff's prisoner administrative appeals ("602 Appeals") to be unassigned from work duties based on medical disability, and to be issued low bunk, soft shoe, cervical pillow and wedge pillow chronos.  If he did not receive these chronos, plaintiff requested to be removed from all medications.

17.  Plaintiff was seen by defendant on December 10, 2012.  (ECF No. 24-5 at 23-24.) Defendant treated plaintiff for his ongoing chronic care issues, including asthma, and authorized further nephrology specialty care for plaintiff.

18.  On December 23, 2012, plaintiff signed a Reasonable Modification or Accommodation Request, noting that he had "stiff and numb hands, bilateral median neuropathies at the wrist, carpal tunnel, and arthritis in both hands," as verified by an EMG report from UCSF, and a rheumatology consultation report from Queen of the Valley Medical Center.  (ECF No. 26 at 27.)  Plaintiff noted that his hands had been numb and stiff the past three weeks, and he needed special gloves to help his blood flow and to keep warm.  Plaintiff sought a limited capacity chrono so that he wasn't rushed during eating, showering or movements.  (Id.)

Appended to this request were copies of Dr. Anderson's 2004 impression of Boutonniere deformities, rheumatoid arthritis, or systemic lupus; Dr. Mehta's February 6, 2006 outpatient health record noting plaintiff's chronic hand arthritis; and Dr. Ralph's July 30, 2008 EMG report noting plaintiff's wrist neuropathies, but adding that these neuropathies do not explain plaintiff's

9

symptoms.  (ECF No. 26 at 29-33.)

19.  Plaintiff was seen by defendant on January 16, 2013.  (ECF No. 24-5 at 25.) Defendant interviewed plaintiff in connection with his 602 Appeals requesting to be issued prison gloves to help with the blood flow in his hands, to be placed on medications for stiffness that he had been taking in 2009, and for a medical work restriction to limited duties.

20.  Plaintiff was seen by defendant on February 6, 2013.  (ECF No. 24-5 at 27.) Defendant reviewed laboratory data, and increased the dosage on his Flovent inhaler in the treatment of his ongoing chronic asthma condition.  Defendant interviewed plaintiff in his review of plaintiff 602 Appeals requesting a referral to podiatry and orthopedics for plantar fasciitis and back pain, and for a soft shoe boots chrono.

21.  Plaintiff was seen by defendant on March 14, 2013.  (ECF No. 24-5 at 29.) Defendant reviewed laboratory studies and approved further nephrology specialty treatment for plaintiff.

22.  Plaintiff was seen by defendant on March 28, 2013.  (ECF No. 24-5 at 31.) Defendant reviewed laboratory data, provided treatment to plaintiff for his chronic care needs including asthma, and authorized further nephrology specialty treatment of plaintiff's chronic kidney disease.

23.  Plaintiff was seen by defendant on April 16, 2013.  (ECF No. 24-5 at 33.)  Defendant reviewed recommendations and notations from the nephrology specialty clinic, and confirmed plans for further nephrology specialty treatment of plaintiff.

24.  Plaintiff was seen by defendant on April 18, 2013.  (ECF No. 24-5 at 35.)  Defendant interviewed plaintiff in his review of plaintiff's 602 Appeal requesting a sleep study and medication for choking in his sleep and snoring.[9]

25.  Plaintiff was seen by defendant on May 8, 2013.  (ECF No. 24-5 at 37.)  Plaintiff complained to defendant that he wanted to see another doctor as his primary care provider in his yard.  Defendant determined that this request was not medically indicated, and informed plaintiff

---

[9]  Plaintiff did not include a claim concerning a sleep study or medication for choking or snoring in his sleep in his complaint or opposition.

that plaintiff did not get to pick and choose who was the primary care doctor in the yard, but would have to accept whomever was there.

26.  In responding to plaintiff's 602 Appeals, defendant reviewed plaintiff's appeal forms and his medical records, analyzed the requests, and conducted a face-to-face interview with plaintiff.  Defendant evaluated whether the requests complied with CDCR policies, were medically necessary, and whether the requested care or treatment was appropriate for the issues presented.

27.  On June 14, 2013, Dr. Chen Yuen at California State Prison, Solano ("CSP-SOL"), issued plaintiff a Comprehensive Accommodation Chrono for arch supports and a renal diet, each marked permanent.  (ECF No. 26 at 44.)  On June 21, 2013, Dr. Yuen issued plaintiff a permanent chrono for a renal diet.  (ECF No. 26 at 43.)

28.  On August 8, 2013, Dr. Yuen at CSP-SOL, issued plaintiff a Comprehensive Accommodation Chrono for a bottom bunk and orthotic boots, each marked permanent.  (ECF No. 26 at 41.)

29.  On September 9, 2013, Dr. Yuen issued plaintiff a Comprehensive Accommodation Chrono for a bottom bunk, orthotic boots, and cervical pillow; all were marked permanent.  (ECF No. 26 at 40.)

30.  On December 17, 2013, while housed at CSP-SOL, plaintiff filed a reasonable modification or accommodation request, stating that he has rheumatoid arthritis, hand stiffness, and bilateral medial neuropathies at the wrist based on a report from UCSF Medical Center Rheumatology Consultation from Michael J. Harrington, Napa, California, and CMF Physician Scott Anderson, and requested that he be provided a pair of gloves and a chrono to have gloves.  (ECF No. 26 at 50.)

31.  On February 5, 2014, Daniel Ramos, a Physician Assistant at CSP-SOL, issued plaintiff a Comprehensive Accommodation Chrono for a bottom bunk, orthotic boots, gloves, and cervical pillow; all were marked permanent.  (ECF No. 26 at 39.)

32.  On February 18, 2014, plaintiff's first level appeal request for gloves due to rheumatoid arthritis was granted, and stated:

11

> A review of your medical shows that you have been assessed by the past two Rheumatology specialists who agree that your physical exam findings are consistent with a diagnosis of rheumatoid arthritis. It was explained to you that lab work for your condition will be ordered and reviewed by your primary care provider.

(ECF No. 26 at 46.)

C. Analysis

i. Legal Standards for Deliberate Indifference to Serious Medical Needs

"[D]eliberate indifference to serious medical needs of prisoners constitutes the unnecessary and wanton infliction of pain, proscribed by the Eighth Amendment. This is true whether the indifference is manifested by prison doctors in their response to the prisoner's needs or by prison guards in intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed." Estelle v. Gamble, 429 U.S. 97, 104-05 (1976) (internal citations, punctuation and quotation marks omitted). "Prison officials are deliberately indifferent to a prisoner's serious medical needs when they 'deny, delay or intentionally interfere with medical treatment.'" Wood v. Housewright, 900 F.2d 1332, 1334 (9th Cir. 1990) (quoting Hutchinson v. United States, 838 F.2d 390, 394 (9th Cir. 1988)).

"A 'serious' medical need exists if the failure to treat a prisoner's condition could result in further significant injury or the 'unnecessary and wanton infliction of pain.'" McGuckin v. Smith, 974 F.2d 1050, 1059 (9th Cir. 1992), overruled on other grounds, WMX Technologies v. Miller, 104 F.3d 1133 (9th Cir. 1997) (en banc) (quoting Estelle, 429 U.S. at 104). Serious medical needs include "[t]he existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; [and] the existence of chronic and substantial pain." McGuckin, 974 F.2d at 1059-60.

To prevail on a claim for deliberate indifference to serious medical needs, a prisoner must demonstrate that a prison official "kn[ew] of and disregard[ed] an excessive risk to inmate health or safety; the official must both be aware of the facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." Farmer v. Brennan, 511 U.S. 825, 837 (1994).

"In the Ninth Circuit, the test for deliberate indifference consists of two parts.  First, the plaintiff must show a serious medical need by demonstrating that failure to treat a prisoner's condition could result in further significant injury or the unnecessary and wanton infliction of pain.  Second, the plaintiff must show the defendant's response to the need was deliberately indifferent.  This second prong . . . is satisfied by showing (a) a purposeful act or failure to respond to a prisoner's pain or possible medical need and (b) harm caused by the indifference."  Jett v. Penner, 439 F.3d 1091, 1096 (9th Cir. 2006) (internal citations, punctuation and quotation marks omitted); accord Wilhelm v. Rotman, 680 F.3d 1113, 1122 (9th Cir. 2012); Lemire v. California Dept. of Corrections and Rehabilitation, 726 F.3d 1062, 1081 (9th Cir. 2013).

"The indifference to a prisoner's medical needs must be substantial.  Mere 'indifference,' 'negligence,' or 'medical malpractice' will not support this claim.  Even gross negligence is insufficient to establish deliberate indifference to serious medical needs."  Lemire, 726 F.3d at 1081-82 (internal citations, punctuation and quotation marks omitted); accord Cano v. Taylor, 739 F.3d 1214, 1217 (9th Cir. 2014).  Moreover, "[a] difference of opinion between a physician and the prisoner -- or between medical professionals -- concerning what medical care is appropriate does not amount to deliberate indifference."  Sanchez v. Vild, 891 F.2d 240, 242 (9th Cir. 1989).

Whether a defendant had requisite knowledge of a substantial risk of harm is a question of fact.  "[A] factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious.  The inference of knowledge from an obvious risk has been described by the Supreme Court as a rebuttable presumption, and thus prison officials bear the burden of proving ignorance of an obvious risk. . . . [D]efendants cannot escape liability by virtue of their having turned a blind eye to facts or inferences strongly suspected to be true . . . ."  Coleman v. Wilson, 912 F. Supp. 1282, 1316 (E.D. Cal. 1995) (citing Farmer, 511 U.S. at 842-43) (internal quotation marks omitted).

When the risk is not obvious, the requisite knowledge may still be inferred by evidence showing that the defendant refused to verify underlying facts or declined to confirm inferences that he strongly suspected to be true.  Farmer, 511 U.S. at 842.  On the other hand, prison officials

13

1    may avoid liability by demonstrating "that they did not know of the underlying facts indicating a

2    sufficiently substantial danger and that they were therefore unaware of a danger, or that they

3    knew the underlying facts but believed (albeit unsoundly) that the risk to which the facts gave rise

4    was insubstantial or nonexistent." Id. at 844.  Thus, liability may be avoided by presenting

5    evidence that the defendant lacked knowledge of the risk and/or that his response was reasonable

6    in light of all the circumstances.  Id. at 844-45; see also Wilson v. Seiter, 501 U.S. 294, 298

7    (1991); Thomas v. Ponder, 611 F.3d 1144, 1150-51 (9th Cir. 2010).

8            ii.  Discussion

9            Rather than address plaintiff's claims by date of treatment or interview, the undersigned

10    addresses plaintiff's claims by topic.

11                a.  Medications and Renal Disease Treatment

12            Plaintiff's broad claims concerning alleged removal of "all" medications and defendant's

13    alleged failure to treat plaintiff's renal disease are unavailing.  In his verified complaint, plaintiff

14    claimed that defendant "removed all [his] medical medications without examinations" and failed

15    to treat plaintiff's renal disease symptoms.  However, during his deposition, plaintiff confirmed

16    that his initial concerns during his first visit with defendant were focused on medications for

17    kidney disease and blood pressure, which plaintiff concedes were addressed appropriately by

18    defendant.  (Pl.'s Depo. at 30-32; 33, 40.)  In his deposition, plaintiff stated that defendant told

19    plaintiff that "we don't prescribe fiber, you can buy that in the canteen.  We don't give Vitamin D

20    here." (Pl.'s Depo. at 31.)  Plaintiff stated that defendant did not want to prescribe the allergy pill

21    plaintiff was previously prescribed.  (Id.)  Plaintiff repeats his claim that defendant discontinued

22    the allergy pills, Vitamin D and fiber.  (ECF No. 26 at 6.)  However, plaintiff did not identify any

23    prescription related to his kidney disease that defendant allegedly refused to prescribe or

24    discontinued prescribing.  (Pl.'s Depo. at 30-32.)

25            By contrast, defendant provided numerous medical progress reports which reflect that

26    plaintiff was continuously prescribed medications for his chronic kidney disease and blood

27    pressure, and regularly seen as a chronic care patient for monitoring of his renal issues, including

28    being provided regular telemedicine nephrology appointments.  (ECF No. 24-5.)  Indeed,

1  defendant issued plaintiff a chrono with "High Risk" intensity of services designation to allow

2  plaintiff to be housed in an appropriate facility to accommodate his medical needs.  (ECF No. 24-

3  4 at 4.)  Plaintiff did not renew his broad allegation concerning medications or treatment for his

4  renal disease in his opposition, and fails to rebut the evidence adduced by defendant.  Therefore,

5  defendant is entitled to summary judgment on these broad claims.

6           b. Pain

7           Plaintiff's pain claims are also unavailing.  In his deposition, plaintiff states that he

8  addressed his pain medication with defendant on October 12, 2012, and concedes that defendant

9  ordered it, and that "took care of it," although plaintiff states that it took three days for plaintiff to

10  get it.  (Pl.'s Depo. at 33-34.)

11          In his opposition, plaintiff notes that in request for admission number 2, defendant denied

12  that he placed plaintiff on Nortriptyline, but that in defendant's points and authorities, defendant

13  admitted to prescribing plaintiff Nortriptyline.  However, in defendant's response, he clarified

14  that he "only continued a medication [plaintiff] was already getting upon his arrival to

15  [HDSP]...."  (ECF No. 26 at 10.)  Plaintiff contends that defendant stated it was not medically

16  indicated for plaintiff to continue taking Tylenol with Codeine, a pain medication recommended

17  by a renal specialist, because plaintiff's condition was stable, but then defendant prescribed

18  plaintiff Nortriptyline, which plaintiff claims is an anti-depressant that plaintiff should not have

19  been given because plaintiff was already taking the anti-depressant Paxil.[10]  (ECF No. 26 at 5.)

20  Plaintiff appears to argue that a doctor at CSP-SOL discontinued the Nortriptyline because of

21  plaintiff's Paxil prescription, citing plaintiff's Exhibit C.  (ECF No. 26 at 5.)  Exhibit C is a copy

22  of progress notes from a May 29, 2013 routine initial psychiatric evaluation.  (ECF No. 26 at 17.)

23  However, Dr. R. Palmer, Staff Psychiatrist at CSP-SOL, noted that plaintiff has been on Paxil for

24  "couple of years" (id.), but stated that plaintiff was "also on Nortriptyline 50 mg bid [without]

25  benefit."  (ECF No. 26 at 19.)  Dr. Palmer does not state that plaintiff could not take both

26  medications at the same time, and did not discontinue plaintiff's prescription to Nortriptyline, at

27  _____

28  [10]  The generic name for Paxil is Paroxetine.

1   least not in the May 29, 2013 progress note.  (ECF No. 26 at 19.)  Plaintiff provided no other

2   medical evidence in support of his arguments concerning Nortriptyline.

3          In his complaint, plaintiff claims he was experiencing "daily pain and suffering."  (ECF

4   No. 1 at 7.)  However, plaintiff did not produce medical evidence to support such a broad claim of

5   pain.  Plaintiff did not submit medical evidence demonstrating that he presented to medical on

6   numerous occasions complaining of pain which defendant failed to treat.  As conceded in his

7   deposition, plaintiff confirmed that defendant appropriately addressed plaintiff's pain medication.

8          Moreover, when plaintiff presented with complaints of pain in his legs on March 28, 2013,

9   he reported that during his telemedicine nephrology appointment he was told that fluid

10  accumulation from his chronic kidney disease was having an effect on causing pains in his legs,

11  and therefore recommendations were going to be made for Lasix[11] and some other medications.

12  (ECF No. 24-5 at 31.)  Defendant noted plaintiff did not have edema in his extremities.

13  Defendant's plan was to follow up pursuant to the telemedicine nephrology report, which was still

14  pending at that time.  (ECF No. 24-5 at 32.)  On April 16, 2013, plaintiff was seen for follow-up,

15  during which he again complained of pain in the back of his legs.  (ECF No. 24-5 at 33.)

16  Defendant again noted no edema in plaintiff's extremities.  Defendant stated that the nephrology

17  recommendations from March 25, 2013, were to prescribe Lasix, and in the interim to prescribe

18  Tylenol 500 mg as necessary.  (ECF No. 24-5 at 34.)  Defendant assessed plaintiff's leg pain

19  complaints as secondary to his chronic kidney disease, and ordered Tylenol as needed.  (Id.)  The

20  April 16, 2013 progress notes do not indicate that defendant prescribed Lasix.  (Id.)  However, the

21  April 18, 2013 progress notes, during which plaintiff was seen for a 602 appeal, reflect plaintiff's

22  prescriptions for Tylenol, 325 mg tablets 3 times a day as needed for leg pain, and Furosemide

23  (Lasix), 20 mg 1 tablet twice a day.  (ECF No. 24-5 at 35.)  Such prescriptions were also noted on

24  the May 8, 2013 progress notes.  (ECF No. 24-5 at 37.)

25         Thus, defendant adduced evidence that plaintiff's pain complaints were appropriately

26  addressed.  Defendant continued plaintiff's prescription for Nortriptyline in connection with

27

28  [11]  The generic name for Lasix is Furosemide.

1    plaintiff's neck pain, and when plaintiff presented with leg pain complaints, defendant provided

2    prescriptions for Tylenol and Furosemide (Lasix).  Plaintiff failed to rebut such evidence.

3    Defendant's alleged failure to physically examine plaintiff is insufficient to rebut the medical

4    evidence that plaintiff was provided appropriate pain medication.  Accordingly, defendant is

5    entitled to summary judgment on plaintiff's pain complaints.

6              c.  <u>Low Bunk Chrono</u>

7         Plaintiff contends that defendant was deliberately indifferent to plaintiff's serious medical

8    needs because he denied plaintiff a low bunk chrono.  However, it is not clear on what basis

9    plaintiff contends defendant should have issued a low bunk chrono, other than the fact that his

10   prior physician provided one.  In his complaint, plaintiff states that he was previously provided a

11   low bunk chrono because of his asthma, shortness of breath, and spinal stenosis.  (ECF No. 1 at

12   6.)  In his deposition, plaintiff maintained he should have received a low bunk chrono because it

13   was recommended by his renal specialist due to plaintiff's kidney issues.  (Pl.'s Depo. at 57.)

14        In his opposition, plaintiff now claims that he was denied a medical examination on his

15   request for a lower bunk during his October 24, 2012 visit with defendant.  (ECF No. 26 at 3.)

16   However, defendant provides his declaration in which he states that he examined plaintiff on

17   October 24, 2012, and determined that there was no medical indication for a low bunk chrono.

18   (ECF No. 24-4 at 4.)  Although plaintiff claims defendant did not physically examine plaintiff,

19   the medical progress note reflects detailed findings from an objective exam, including normal

20   bowel sounds in plaintiff's abdomen, no edema in his extremities, and that plaintiff "was able to

21   get on and off the examination table without any difficulty."  (ECF No. 24-5 at 17.)  Plaintiff fails

22   to describe what symptoms were present on October 24, 2012, that warranted placement in a

23   lower bunk, or how defendant failed to appropriately examine plaintiff on this occasion.  Rather,

24   plaintiff appears to argue that he was entitled to a low bunk chrono because he was previously

25   provided a low bunk chrono.  (ECF No. 26 at 6.)  Such argument, without more, is insufficient to

26   rebut defendant's evidence demonstrating no need for a low bunk chrono, in his medical opinion,

27   on October 24, 2012.

28   /////

On April 16, 2013, defendant noted the renal specialist's recommendation that plaintiff be provided a low bunk "due to leg pain complaints." (ECF No. 24-5 at 34.)  However, in his progress note, defendant stated that "[a]t this time I do not believe there is a need for a bottom bunk Chrono." (ECF No. 24-5 at 34.)  Moreover, defendant treated plaintiff's leg complaints with medications, arguably an alternative treatment to low bunk housing.  And, in his deposition, plaintiff conceded that the Lasix or "water pill" reduced plaintiff's swelling.  (Pl.'s Depo. at 59-60.)

As set forth above, a mere difference of opinion between doctors does not give rise to liability on a § 1983 claim.  See Toguchi, 391 F.3d at 1059–60 ("Dr. Tackett's contrary view was a difference of medical opinion, which cannot support a claim of deliberate indifference."); Sanchez, 891 F.2d at 242 (difference of opinion between medical personnel regarding the need for surgery does not amount to deliberate indifference to a prisoner's serious medical needs).  To establish that a difference of medical opinion as to the appropriate course of treatment amounted to deliberate indifference, the evidence must "show that the course of treatment the doctors chose was medically unacceptable under the circumstances" and that "they chose this course in conscious disregard of an excessive risk to [the prisoner's] health." Jackson v. McIntosh, 90 F.3d 330, 332 (9th Cir. 1996).

Plaintiff has failed to demonstrate that defendant's failure to provide plaintiff with a low bunk chrono was medically unacceptable under the circumstances.  Review of the medical care provided demonstrates that plaintiff's cervical pain was treated with Nortriptyline, and his later complaints of leg pain were treated with Furosemide (Lasix), which helped the leg swelling, and Tylenol, as needed, for pain.  Also, plaintiff's medications for asthma were adjusted as necessary. (ECF No. 24-5.)  Plaintiff fails to identify what symptom plaintiff was suffering that a physical examination, or more thorough examination, would have demonstrated a low bunk was medically necessary at that time.  Plaintiff identifies no other medical evidence requiring that plaintiff be housed in a low bunk.

In addition, during his deposition, plaintiff stated that correctional officers gave plaintiff a low bunk, but that plaintiff was at risk of being bumped by someone who had a low bunk chrono.

18

1   (Pl.'s Depo. at 56.)  Plaintiff does not state that he was subsequently bumped to an upper bunk,

2   and does not indicate that he was housed in an upper bunk during the seven months he was

3   incarcerated at HDSP, and he makes no allegations as to any injuries sustained while being

4   housed in an upper bunk, if any.  (ECF Nos. 1, 26.)

5          Although plaintiff was previously and subsequently provided a low bunk chrono by other

6   doctors, the fact that defendant, in his medical opinion, did not believe plaintiff's medical

7   condition warranted a low bunk chrono, does not rise to the level of deliberate indifference.

8   Rather, absent medical evidence to the contrary, it represents a difference of medical opinion.

9   Thus, defendant is entitled to summary judgment on plaintiff's claim concerning a low bunk

10  chrono.

11                        d.  Boots or Soft Shoe Chrono

12         Plaintiff's claim concerning his boots or soft shoe chrono presents a closer question.  In

13  his verified complaint, plaintiff alleges that when he arrived at HDSP, he told defendant that his

14  boots were approved by a podiatrist for chronic plantar fasciitis, and back pain to help plaintiff's

15  spinal stenosis, but defendant allowed custody staff to throw the boots away.  (ECF No. 1 at 6,

16  30.)  Upon arrival at HDSP, plaintiff had a permanent chrono for soft shoes with supports and

17  boots, and which noted plaintiff's stenosis and plantar fasciitis.  (ECF No. 1 at 36.)  Although the

18  nurse practitioner discontinued plaintiff's chrono, and confiscated plaintiff's boots upon his

19  arrival at HDSP, it appears that defendant could have avoided plaintiff's boots being thrown out

20  by writing plaintiff a chrono for the boots, if defendant found the boots medically necessary.

21         In the October 12, 2012 progress note, the first time defendant treated plaintiff, defendant

22  noted that "there is no Nephrology notes in the electronic Unit Health Record (eUHR) and the

23  patient is seen without a Unit Health Record (UHR)."  (ECF No. 24-5 at 10.)  The undersigned

24  questions whether it is sound policy for medical professionals to automatically discontinue

25  medical classification chronos immediately upon arrival to HDSP, particularly where medical

26  personnel may not have the prisoner's complete medical records to properly assess the issuance

27  of new chronos at that time.  It is also interesting that despite the alleged absence of the UHR,

28  defendant was able to record plaintiff's exhaustive medical history and list of prescriptions at the

1    October 12, 2012 visit.  (ECF No. 24-5 at 10.)

2         In his response to plaintiff's request for admission number 1, in which plaintiff asked

3    defendant to admit that plaintiff has chronic plantar fasciitis, and back and neck pain, defendant

4    stated that he lacked "knowledge or information as to allegations of complaint of chronic plantar

5    fasciitis and complaint of back and neck pain, as there is no way to verify either," and denied the

6    request for admission on that basis.  (ECF No. 26 at 10.)  When asked to admit that plaintiff

7    showed defendant a chrono for personal boots, defendant stated that he does not recall being

8    shown such a chrono.  (ECF No. 26 at 10.)

9         However, during his deposition, plaintiff stated that he discussed the chronos with

10   defendant, but that defendant told plaintiff he can't bring medical appliances from other

11   institutions.  (Pl.'s Depo. at 34.)  Plaintiff claimed that defendant told plaintiff that since he

12   already had foot surgery, there was no need for the boots he had previously.  (Id.)  Plaintiff stated

13   that defendant denied plaintiff's request for a referral to a podiatrist.  (Pl.'s Depo. at 36.)  In his

14   opposition, plaintiff claims that he attached all the chronos from CMF to his 602 appeals.  (ECF

15   No. 26 at 5.)  It is undisputed that defendant heard plaintiff's appeals.

16        Neither party provided medical records from plaintiff's prior foot surgery, or from

17   plaintiff's medical examination by a podiatrist, if he had one.  None of the medical records

18   provided from HDSP include such history in the "past medical history" sections of the medical

19   progress notes, which are otherwise exhaustive, except for the additional failure to reference

20   plaintiff's alleged rheumatoid arthritis or lupus, which were referenced in medical records

21   provided by plaintiff.

22        During his deposition, plaintiff conceded that his focus during the first visit with

23   defendant was on making sure plaintiff received his medications for his kidney disease and blood

24   pressure.  There is no mention in the October 12, 2012 progress note that plaintiff requested to

25   retain his boots, and in his deposition plaintiff stated that it was the "next time" he saw defendant

26   about the chronos for boots, and that is when he asked defendant for a physical exam.  (Pl.'s

27   Depo. at 40, 41.)  Plaintiff claims defendant was looking at plaintiff's records and said there was

28   nothing to show plaintiff had medical problems regarding these issues.  (Pl.'s Depo. at 42.)

Plaintiff disputes this claim, stating that the "triage lady" and the nurse practitioner pulled them up on the computer but that in any event, plaintiff had the chronos with him during the visit with defendant. (Pl.'s Depo. at 39.) Plaintiff claims defendant said, "You don't need an exam at this time." (Id.)

Prior to February 6, 2013, none of the objective findings registered on the progress notes indicate that defendant examined plaintiff's feet. (ECF No. 24-5 at 10-26.) In his declaration, defendant does not expressly state that he examined plaintiff's feet and determined that, based on such physical exam and in his medical opinion, plaintiff did not require a soft shoe chrono or the boots previously provided. By contrast, plaintiff declares, in his complaint, opposition, and in his deposition, that defendant did not physically examine plaintiff in connection with this chrono. (ECF Nos. 1 at 5; 26 at 3.) "He didn't ask me to take off my shoes to look at my feet." (Pl.'s Depo. at 38.) Defendant "never gave plaintiff a physical examination before denying plaintiff medical treatment." (ECF No. 26 at 2.)

The November 5, 2012 progress note states that plaintiff told defendant that plaintiff has "chronos for cervical pillows and other items which are not in the electronic Health Record (eUHR)." (ECF No. 24-5 at 19.) However, this note could be read two different ways. It could be read to mean that plaintiff did not have current chronos, issued by medical staff at HDSP. Or it could be read to mean that plaintiff's prior chronos, discontinued when plaintiff arrived at HDSP, were not in plaintiff's UHR at the time defendant accessed plaintiff's records on November 5, 2012. Defendant's progress note concerning these chronos raises an inference that plaintiff spoke to defendant about these chronos, despite plaintiff's "chief complaint" being registered as "he is not getting a renal diet." (ECF No. 24-5 at 19.)

It is undisputed that defendant did not examine plaintiff on November 19, 2012, when interviewing plaintiff in connection with his 602 appeal for a soft shoe chrono and referral to podiatry and orthopedics for plaintiff's plantar fasciitis and back pain. Defendant denied plaintiff's request based on his standard review process, which defendant contends does not require a physical examination. However, if defendant did not examine plaintiff's feet during prior medical appointments, plaintiff had no recourse other than to file an appeal which, oddly,

was then heard by defendant.  Had an objective third party heard plaintiff's appeal, and plaintiff informed that third party that defendant had not examined plaintiff's feet, a reasonable person would either examine plaintiff's feet (if medical staff), or ensure that plaintiff's feet were examined.  Moreover, although defendant declares that his appeal process review included a review of plaintiff's medical records, he does not state that he reviewed records pertaining to plaintiff's prior foot surgeries or foot issues, or that no records pertaining to plaintiff's prior foot issues were in the medical records at the time defendant reviewed the relevant appeals.  In light of the absence of any reference to plaintiff's prior foot surgeries in the medical histories set forth in the progress notes provided by defendant, and plaintiff did not provide such records with his opposition, it appears possible that such records might not have been included in the medical records for plaintiff at HDSP.  However, plaintiff provided other medical records pertaining to his prior rheumatology appointments which were also not reflected in the HDSP progress notes.  Thus, it is unclear on this record whether no such medical records concerning plaintiff's feet issues exist, or whether such records were simply not included in plaintiff's records at HDSP.

In addition, in his deposition, plaintiff avers that November 19, 2012, was the first time that defendant told plaintiff he "had nothing coming."  (Pl.'s Depo. at 45.)  Plaintiff states that at his next sick call visit, defendant told plaintiff "I told you you don't have nothing coming."  (Id.) "As long as you at [sic] at HDSP, you have nothing coming."  (Id.)  Such statements, taken as true for purposes of this motion, raise an inference of defendant's culpable state of mind.

On February 6, 2013, in addition to lab and chronic care follow-ups, defendant saw plaintiff "for a 602 appeal, stating he wants his personal shoes."  (ECF No. 24-5 at 27.)  In the subjective portion of the notes, defendant noted plaintiff wanted soft shoe boots as part of his 602 appeal, and wanted "referral to podiatry and orthopedics for plantar fasciitis and back pain." (ECF No. 24-5 at 27.)  Defendant's progress note reflects the following objective findings:

> Shoes and socks are removed.  No abrasion or ulceration is present. Well healed status post surgical scar present on the feet.  Sensory examination is normal. Capillary refill is normal. NEUROLOGIC: Grossly within normal limits.  Patient able to get on and off examination table without any difficulty.  Patient able to walk on heels/toes and squat.  Sensory examination is normal.  Deep tendon reflexes 2/2 in the upper and lower extremities.  The strength in

upper and lower extremities 5/5.   The patient has full range of motion of the back.

(ECF No. 24-5 at 27.)  For assessment and plan, defendant concluded "[t]here is no medical indication at this time for soft shoe chrono or orthopedic or podiatry referrals." (ECF No. 24-5 at 28.)  Because none of the medical progress notes by defendant reflect plaintiff's prior foot surgeries in the past medical history portion of the reports, the fact that defendant noted plaintiff's post-surgical scar on plaintiff's feet raises an inference that defendant did examine plaintiff's feet on February 6, 2013.  However, in his statement of undisputed facts, plaintiff claims there is a dispute of fact as to whether he was examined by defendant on February 6, 2013, for plantar fasciitis.  (ECF No. 26 at 3.)  As noted above, plaintiff avers that defendant did not examine plaintiff's feet.

In subsequent HDSP medical progress notes, there is no mention of plaintiff's request for a chrono for soft shoes or boots.  (ECF No. 24-5 at 29-45.)  Although it appears that plaintiff now claims that defendant did not examine plaintiff on March 28, 2013, or April 16, 2013, he does not allege that he presented to medical on these days requesting such chronos or complaining of pain in his feet related to his plantar fasciitis or back pain.  Thus, treatment on March 28, 2013, or April 16, 2013, is not relevant to the instant claim.

Finally, in his deposition, plaintiff avers that as soon as plaintiff was transferred to CSP-SOL, Dr. Chen Yuen put in the order for plaintiff's boots:  "As soon as he examined my foot, he ordered them." (Pl.'s Depo. at 77.)  Although defendant claims that in his medical opinion, the accommodations on the chrono form were not medically necessary, he does not specifically explain the basis for such opinion that the boots or soft shoe chrono were not medically necessary given plaintiff's history of foot surgery, plantar fasciitis, and back pain from the stenosis.  It is unclear from the current record whether defendant was privy to medical records from plaintiff's prior foot surgery, or to medical records from previous institutions where plaintiff may have been treated for plantar fasciitis.  In his deposition, plaintiff avers that he had tendon surgery in both feet, and suffers from chronic plantar fasciitis, and sometimes his feet swell, supporting his claim that the boots and soft shoe chronos are medically necessary.  (Pl.'s Depo. at 77, 83-84.)

23

As defense counsel argues, a mere difference of opinion between doctors does not give rise to liability on a § 1983 claim.  See Sanchez, 891 F.2d at 242.  Ultimately, defense counsel may prove that plaintiff's claim concerning his boots and soft shoe chrono is simply a difference of opinion.  On the other hand, plaintiff may well be able to establish that this is instead a case in which defendant deliberately ignored plaintiff's prior treating physician's medical chrono recommending that plaintiff be allowed his boots and a soft shoe chrono based on chronic plantar fasciitis and back pain, or was deliberately indifferent by failing to examine plaintiff's feet which would have demonstrated the medical necessity for such chronos.  It is well established that deliberate indifference may be shown when prison officials ignore express orders from a prisoner's treating physician.  See Estelle, 429 U.S. at 104-05 (deliberate indifference may manifest "by prison doctors in their response to the prisoner's needs or by prison guards in intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed"); Jett, 439 F.3d at 1097-98 (prison doctor may have been deliberately indifferent to a prisoner's medical needs when he decided not to request an orthopedic consultation as the prisoner's emergency room doctor had previously ordered); Lopez v. Smith, 203 F.3d 1122, 1132 (9th Cir. 2000) (a prisoner may establish deliberate indifference by showing that a prison official intentionally interfered with his medical treatment); Wakefield v. Thompson, 177 F.3d 1160, 1165 & n.6 (9th Cir. 1999) ("a prison official acts with deliberate indifference when he ignores the instructions of the prisoner's treating physician or surgeon.").  Here, plaintiff has firsthand knowledge of whether defendant examined his feet, as well as plaintiff's prior surgeries for tendon repair and personal history of chronic plantar fasciitis, which is commonly known to be a painful condition, and back pain from his spinal stenosis.  Plaintiff has provided such chronos from two different doctors, one at CMF and Dr. Yuen at CSP-SOL. Thus, plaintiff has demonstrated a material dispute of fact exists as to whether defendant was deliberately indifferent to plaintiff's need for his boots and a soft shoe chrono.

Accordingly, defendant is not entitled to summary judgment on plaintiff's claim that defendant was deliberately indifferent for failing to provide a soft shoe chrono or a chrono for plaintiff's boots.

1       e. Pillow Chronos

2       Plaintiff contends that defendant was deliberately indifferent to plaintiff's serious medical

3 needs based on defendant's failure to provide cervical and wedge pillow chronos. However,

4 plaintiff failed to adduce medical evidence demonstrating that such pillows were medically

5 necessary. Defendant declares that such accommodations were not medically necessary. Plaintiff

6 concedes that defendant told plaintiff he could roll up his jacket to use as a pillow, and in his

7 deposition, conceded that after plaintiff was prescribed Lasix he no longer needed the wedge

8 pillow. The records reflect that defendant provided plaintiff with Nortriptyline for his cervical

9 pain, and that when plaintiff presented with complaints of leg pain, defendant prescribed plaintiff

10 with Lasix, a diuretic to remove excess fluid from plaintiff's legs, and Tylenol for pain.

11 Moreover, in the October 12, 2012 progress note, defendant noted that plaintiff had neck surgery

12 a year ago, and ordered that plaintiff's prescription for Tylenol be tapered and discontinued. This

13 note supports defendant's finding that the pillow was not medically necessary. Plaintiff adduced

14 no medical evidence that cervical or wedge pillows were medically necessary at the time plaintiff

15 was transferred to HDSP. The fact that other physicians provided chronos for such pillows, in

16 light of the medical evidence provided by defendant, only demonstrates a difference of opinion.

17 Thus, defendant is entitled to summary judgment on this claim.

18       f. Hand Stiffness and Need for Gloves

19       In his verified complaint, plaintiff stated that defendant would not address plaintiff's

20 "carpal tunnel," and claims he has serious pain and stiffness in his hands. (ECF No. 1 at 6.)

21 Plaintiff references medical records from 2004 to 2008, as well as carpal tunnel surgical records

22 from the repair performed in 2009, all of which occurred prior to plaintiff's transfer to HDSP.

23 (ECF No. 1 at 13-30.) In his opposition, plaintiff claims that defendant was aware of these issues

24 based on defendant's January 16, 2013 progress notes, and argues that if defendant had examined

25 plaintiff, he would have seen that a medical chrono for gloves was medically necessary. (ECF

26 No. 26 at 6.) Plaintiff provided a copy of his medication list from May 9, 2009, which included

27 Gabapentin. (ECF No. 26 at 37.) In his deposition, plaintiff avers that when plaintiff presented

28 for this appeal review, defendant said "nothing coming," and defendant did not want to look at

1    plaintiff's documents.  (Pl.'s Depo. at 70.)

2            In support of this claim, plaintiff alleges that the first time his hands locked up at CSP-

3    SOL due to cold weather, he put in a CDCR 1824 for gloves to help poor circulation and

4    neuropathy, the 1824 was turned into a health care appeal, and was granted at the first level.

5    (ECF No. 26 at 46.)  Physician Assistant Daniel Ramos interviewed plaintiff at CSP-SOL on

6    February 4, 2014, and noted that "review of [plaintiff's] medical shows that [plaintiff has] been

7    assessed by the past two Rheumatology specialists who agree that [plaintiff's] physical exam

8    findings are consistent with a diagnosis of rheumatoid arthritis."  (ECF No. 26 at 46.)  On

9    February 4, 2014, Ramos wrote plaintiff a chrono for gloves.  (ECF No. 26 at 39.)  Plaintiff

10   contends that the cold weather in Susanville, California, and his hand stiffness prevented him

11   from performing daily activities.  (ECF No. 26 at 7.)

12           Defendant interviewed plaintiff on January 16, 2013,[12] to address plaintiff's requests for

13   HDSP-issued gloves to help with the blood flow in his hands, to be placed on medications for

14   stiffness that he had been taking in 2009, and to receive a work restriction to limited duties.  (ECF

15   No. 24-4 at 5.)  Defendant determined that none of plaintiff's requests were medically indicated

16   by reviewing plaintiff's medical records and plaintiff's appeals.  (ECF Nos. 24-4 at 2, 5.)  None

17   of the medical records from HDSP provided by defendant reflect plaintiff's medical history of

18   rheumatoid arthritis or rheumatology consultations.  (ECF No. 24-5.)

19           In request for admission number 5, plaintiff asked defendant to admit that he was aware

20   that plaintiff had bilateral median neuropathies at the wrist, and hand stiffness and arthritis.  (ECF

21   No. 26 at 10.)  Defendant denied he was aware of "bilateral median neuropathies at the wrist

22   since patient/plaintiff had surgery for treatment of his carpal tunnel;" defendant does "not recall

23   plaintiff having hand stiffness or arthritis," and denied the request on that basis.  (ECF No. 26 at

24   11.)

25   /////

26   ─────────────────────
     [12]  In his deposition, plaintiff explained that he had his previously-issued gloves, and therefore did
27   not file an appeal for gloves until they were taken away.  (Pl.'s Depo. at 71.)  Plaintiff stated that
     he lost about five pair of gloves while housed at HDSP, but explained they were not medically-
28   issued gloves, but homemade gloves cut out of sweatshirts.  (Pl.'s Depo. at 74-75.)

1    It is undisputed that defendant did not examine plaintiff on January 16, 2013.  Defendant

2    contends no examination was required because it was an interview for a 602 appeal.  However, in

3    plaintiff's December 23, 2012 request for accommodation, which appears to have been converted

4    to an appeal, HDSP HC 12026879,[13] plaintiff clearly noted his stiff and numb hands,

5    neuropathies, and arthritis in both hands.  (ECF No. 26 at 27.)  Plaintiff stated that his hands had

6    been numb and stiff the past three weeks, and that he did not have the strength to push the water

7    button.  (Id.)  Plaintiff claimed that the gloves would help his blood flow and keep his hands

8    warm.  (Id.)

9    Moreover, in his deposition, plaintiff claims that in addition to defendant failing to

10   examine plaintiff's hands, defendant told him he had "nothing coming," and wouldn't review the

11   documents plaintiff had to support his request for gloves.  Plaintiff claims that he had the

12   documents showing that plaintiff has rheumatoid arthritis, but that defendant wouldn't review

13   them.  (Pl.'s Depo. at 72.)  Plaintiff avers that defendant told plaintiff that "they don't do chronos

14   for gloves."  (Pl.'s Depo. at 71.)  Plaintiff states there was snow, hail, and ice coming down.

15   (Pl.'s Depo. at 72.)  In his declaration, defendant does not address the 2004 or 2008 reports from

16   the rheumatology consultations, but merely claims that none of plaintiff's requests were

17   medically indicated.  (ECF No. 24-4 at 5.)

18   As defense counsel argues, a mere difference of opinion between doctors does not give

19   rise to liability on a § 1983 claim.  See Sanchez, 891 F.2d at 242.  Ultimately, defense counsel

20   may prove that plaintiff's claim concerning his request for a chrono for gloves is simply a

21   difference of opinion.  On the other hand, plaintiff may well be able to establish that this is

22   instead a case in which defendant deliberately ignored plaintiff's prior rheumatology consultant's

23   reports reflecting plaintiff's rheumatoid arthritis and "classic Boutonniere deformities" (ECF Nos.

24   26 at 53, 55), or was deliberately indifferent by failing to examine plaintiff hands or review

25   plaintiff's documents which, taken as true, would have demonstrated the medical necessity for the

26

27

28

[13]  Surprisingly, defendant's medical progress note from the January 16, 2013 appeal interview does not reflect the 602 appeal number.  (ECF No. 24-5 at 25.)  However, the subjective complaints are very similar to those set forth in plaintiff's appeal HDSP HC 12026879.  (ECF No. 26 at 27.)

glove chrono.  As set forth above, it is well established that deliberate indifference may be shown when prison officials ignore express orders from a prisoner's treating physician.  See Estelle, 429 U.S. at 104-05 (deliberate indifference may manifest "by prison doctors in their response to the prisoner's needs or by prison guards in intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed"); Lopez v. Smith, 203 F.3d 1122, 1132 (9th Cir. 2000) (a prisoner may establish deliberate indifference by showing that a prison official intentionally interfered with his medical treatment); Wakefield v. Thompson, 177 F.3d 1160, 1165 & n.6 (9th Cir. 1999) ("a prison official acts with deliberate indifference when he ignores the instructions of the prisoner's treating physician or surgeon.").

Here, plaintiff has firsthand knowledge of whether defendant refused to review the paperwork supporting plaintiff's request for a chrono for gloves, and whether the cold winters at HDSP worsened plaintiff's hand stiffness.  Rheumatoid arthritis is commonly known to be a painful condition that causes stiffness.  In support of his claim, plaintiff has provided a chrono from Physician's Assistant Ramos who wrote plaintiff a glove chrono because Ramos' physical exam findings were consistent with the diagnosis of rheumatoid arthritis.  It is common knowledge that Susanville, where HDSP is located, generally has colder winters than Solano, California.  Defendant's alleged refusal to review plaintiff's documents and his immediate statement, taken as true for purposes of this motion, that plaintiff had "nothing coming," demonstrates a culpable state of mind.  Thus, plaintiff has demonstrated a material dispute of fact exists as to whether defendant was deliberately indifferent to plaintiff's need for a chrono for gloves in light of the harsh winter at HDSP.

     ii. Qualified Immunity

Having concluded that genuine issues of material facts exist as to whether defendant was deliberately indifferent to plaintiff's serious medical needs, in violation of the Eighth Amendment, the undersigned next addresses whether he is entitled to qualified immunity regarding plaintiff's claims concerning his boots and soft shoe chrono and chrono for gloves.  A court considering a claim of qualified immunity must determine whether the plaintiff has alleged the deprivation of an actual constitutional right and whether such right was clearly established

1    such that it would be clear to a reasonable officer that his conduct was unlawful in the situation he

2    confronted.  See Pearson v. Callahan, 555 U.S. 223 (2009).

3          Although the facts at trial might show otherwise, at this stage, the unresolved factual

4    allegations as viewed in the light most favorable to plaintiff show a violation of his right to be

5    free from cruel and unusual punishment as to plaintiff's boots and gloves claims.  "It is settled

6    law that deliberate indifference to serious medical needs of prisoners violates the Eighth

7    Amendment."  Jackson, 90 F.3d at 332 (citing Estelle, 429 U.S. at 104).  "Prison officials are

8    deliberately indifferent to a prisoner's serious medical needs when they deny, delay, or

9    intentionally interfere with medical treatment."  Hunt v. Dental Dept., 865 F.2d 198, 201 (9th Cir.

10   1989) (internal quotations and citation omitted).  "For a right to be clearly established it is not

11   necessary that the very action in question have previously been held unlawful. . . .  To define the

12   law in question too narrowly would be to allow defendants to define away all potential claims."

13   Jackson, 90 F.3d at 332 (internal quotations and citations omitted).

14         Because defendant has not produced sufficient evidence to demonstrate that his actions

15   were reasonable, Doe v. Petaluma City School Dist., 54 F.3d 1447, 1450 (9th Cir. 1995), the

16   undersigned cannot say as a matter of law that it was objectively reasonable for defendant to

17   believe that the facts as they stand on summary judgment showed no violation of a clearly

18   established right.  Accordingly, these issues remain to be resolved in further proceedings, and

19   summary judgment on defendant's request for qualified immunity should be denied on plaintiff's

20   Eighth Amendment claims concerning his boots and soft shoe chrono and chrono for gloves.

21   III.  Conclusion

22         In accordance with the above, IT IS HEREBY ORDERED that the Clerk of the Court is

23   directed to assign a district judge to this case; and

24         IT IS HEREBY RECOMMENDED that defendant's motion for summary judgment (ECF

25   No. 24) be granted in part and denied in part, as follows:

26         1. Defendant's motion for summary judgment as to plaintiff's claims concerning his

27   boots and soft shoe chrono and chrono for gloves be denied; and

28         2. Defendant's motion for summary judgment be granted on all remaining claims.

29

1      These findings and recommendations are submitted to the United States District Judge

2   assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within fourteen days

3   after being served with these findings and recommendations, any party may file written

4   objections with the court and serve a copy on all parties.  Such a document should be captioned

5   "Objections to Magistrate Judge's Findings and Recommendations."  Any response to the

6   objections shall be served and filed within fourteen days after service of the objections.  The

7   parties are advised that failure to file objections within the specified time may waive the right to

8   appeal the District Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

9   Dated:  January 13, 2015

10

11                                                                      KENDALL J. NEWMAN
                                                                          UNITED STATES MAGISTRATE JUDGE
12

13   smit0738.msj

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

                                                    30